FILED

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2012 OCT 15 P 1: 32

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| JOHN PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No.  1:12CV1150 LO/JFA |
| | ) |
| MARK ORDAN, GLYN AEPPEL, THOMAS | )  **JURY TRIAL DEMANDED** |
| DONOHUE, STEPHEN HARLAN, PAUL | ) |
| KLAASSEN,   LYNN   KROMINGA, | ) |
| WILLIAM LITTLE, SUNRISE SENIOR | ) |
| LIVING, INC., HEALTH CARE REIT, INC., | ) |
| BREWER   HOLDCO,   INC.,   BREWER | ) |
| HOLDCO SUB, INC., and RED FOX INC., | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff John Price ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.     Plaintiff brings this class action against members of the Sunrise Senior Living, Inc. ("Sunrise" or the "Company") Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duties arising out of their attempt to sell the Company to Health Care REIT, Inc. ("Health Care REIT") for an unfair price and without material information necessary for shareholders to make an informed vote.   Additionally, Plaintiff, individually, brings a claim against Defendants for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     On August 22, 2012, Health Care REIT and the Company announced a definitive agreement under which Health Care REIT, through the companies' wholly owned subsidiaries

Brewer Holdco, Inc., Brewer Holdco Sub, Inc., and Red Fox, Inc. ("Merger Subs"), will acquire all of the outstanding shares of Sunrise in an all-cash transaction for $14.50 per share in cash (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $845 million. The Board has breached its fiduciary duties by agreeing to the Proposed Transaction for inadequate consideration. As described in more detail below, given Sunrise's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.

3.      Defendants have further exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, pursuant to the merger agreement dated August 21, 2012 (the "Merger Agreement"), defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Health Care REIT with four business days to match any competing proposal in the event one is made; (iii) a provision that requires the Company to pay Health Care REIT a termination fee of $40 million in order to enter into a transaction with a superior bidder; and (iv) an amendment to the Company's poison pill embodied in an Amendment to the Rights Agreement between Sunrise and American Stock Transfer & Trust Company (the "Poison Pill Amendment") dated August 22, 2012, eliminating the poison pill as a barrier to the Proposed Transaction while, at the same time, leaving it in place as a barrier to any potential competing acquisition offer. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Sunrise.

2

4.    On September 28, 2012, Sunrise filed a Preliminary Proxy Statement ("Preliminary Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.   The Preliminary Proxy fails to provide the Company's shareholders with material information necessary for them to make an informed decision regarding whether to vote in favor of the Proposed Transaction or seek appraisal for their shares.  Defendants have violated Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by omitted material facts necessary to render the Preliminary Proxy not misleading.  Defendants have breached their fiduciary duty of care by failing to disclose material information to the Sunrise shareholders necessary for them to determine whether to vote in favor of the Proposed Transaction.

5.    The Individual Defendants have breached their fiduciary duties of loyalty and care, and Health Care REIT and Merger Subs have aided and abetted such breaches by Sunrise's officers and directors.  Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  Plaintiff is a citizen of Michigan and no defendant is a citizen of Michigan.

8.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.     Venue is proper in this district because Sunrise has its principal place of business in this District.

## PARTIES

10.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Sunrise.

11.     Sunrise is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal executive offices at 7900 Westpark Drive, McLean, Virginia 22102. Sunrise is named herein solely for the purpose of providing full and complete relief.

12.     Defendant Mark Ordan ("Ordan") has been the Chief Executive Officer and a director of the Company since 2008. Ordan is a citizen of Maryland.

13.     Defendant Glyn Aeppel ("Aeppel") has been a director of the Company since 2008. Aeppel is a citizen of New York.

14.     Defendant Thomas Donohue ("Donohue") has been a director of the Company since 1995. Donohue is a citizen of Maryland.

15.     Defendant Stephen Harlan ("Harlan") has been a director of the Company since 2007. Harlan is a citizen of Maryland.

16.     Defendant Paul Klaassen ("Klaassen") has been a director of the Company since 1981. Klaassen is a citizen of Virginia.

17.     Defendant Lynn Krominga ("Krominga") has been a director of the Company since 2007. Krominga is a citizen of New York.

18.     Defendant William Little ("Little") has been a director of the Company since 2004. Little is a citizen of Pennsylvania.

19.     Defendants referenced in ¶¶ 12 through 18 are collectively referred to as the Individual Defendants and/or the Board.

20.     Defendant Health Care REIT is a Delaware corporation with its headquarters located at 4500 Dorr Street, Toledo, Ohio, 43615. Health Care REIT is a real estate investment trust that invests across the full spectrum of senior housing and health care real estate as well as providing an extensive array of property management and development services.

21.     Defendants Merger Subs were created for the purpose of effectuating the Proposed Transaction.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

22.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Sunrise and owe them, as well as the Company, a duty of care and loyalty.

23.     Under Delaware law, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control, a breakup of the corporation's assets, or a sale of the corporation, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

    (b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

    (c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

    (d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

24.     In accordance with their duty of loyalty, the Individual Defendants are obligated to refrain from:

    (a)     participating in any transaction where the Individual Defendants' loyalties are divided;

    (b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

    (c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties of care an loyalty owed to plaintiff and other public shareholders of Sunrise.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings Counts I and IV of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of all owners of Sunrise common stock as of August 22, 2012, when the Proposed Transaction was announced (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives,

heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According to the Merger Agreement, as of August 20, 2012, 58.2 million shares of common stock were represented by the Company as outstanding.  All members of the Class may be identified from records maintained by Sunrise or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.     Questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)     Whether the Individual Defendants breached their fiduciary duties of undivided loyalty or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)    Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)   Whether the Individual Defendants misrepresented and omitted material facts in violation of the fiduciary duties owed by them to Plaintiff and the other members of the Class;

7

(iv)    Whether Health Care REIT and Merger Subs aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(v)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

29.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

30.    Plaintiff is committed to prosecuting this action, will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

31.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

32.    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

33.    Defendants have acted on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Background

34.     Sunrise Senior Living, Inc. is a provider of senior living services in the United States, Canada, and the United Kingdom.   The Company offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative services.

35.     The Company has enjoyed a successful beginning to fiscal 2012. On May 1, 2012, Sunrise issued a press release announcing its fiscal 2012 first quarter financial results for the quarterly period ending on March 31, 2012.   Sunrise reported quarterly net income of $2.0 million or $0.03 per fully diluted share, as compared to a net loss of $17.7 million, or $0.32 per fully diluted share for the first quarter of 2011. The Company's first quarter revenue was $335.6 million, a $15.4 million increase compared to the $320.2 million from the first quarter of 2011. In the same press release, the Company also reported 2012 first quarter EBITDA of $21.0 million, a sharp increase compared to negative EBITDA of $9.2 million for the same quarter in 2011.

36.     Defendant Ordan was satisfied with the Company's strong quarterly results and was optimistic about Sunrise's future business prospects. Ordan was quoted in the Company's May 1, 2012 press release as saying, "We are very pleased by our strong quarter and by the progress we are making to keep Sunrise at the forefront of caring for seniors, for years to come."

37.     The Company maintained its momentum in the second quarter of fiscal 2012. On August 2, 2012 the Company announced its second quarter financial results for the quarterly period ending on June 30, 2012. In the second quarter of fiscal 2012, Sunrise reported net income of $9.6 million or $0.16 per fully diluted share, as compared to net income of $1.3

million, or $0.02 per fully diluted share for the second quarter of 2011. Sunrise's quarterly revenues were $337.7 million, a $16.4 million increase compared to $321.3 million in revenues from the second quarter of 2011. Additionally, Sunrise announced EBITDA of $30.1 million, roughly double the $15.2 million for the same quarter the prior year.

38.     In the August 2, 2012 press release, Defendant Ordan commented on the quarter and was quoted as saying, "Our quarter's results were strong thanks to solid occupancy and rate along with reduced overhead. We continue to invest in our future through increasing investments in care and information systems."

39.     Defendant Ordan also promoted the Company by touting favorable industry trends. For instance, in his February 7, 2012 presentation at the UBS Global Healthcare Services Conference Ordan explained that the senior living industry was poised for growth because of an aging population and high demand for senior housing. Slide 10 of Ordan's presentation highlighted the attractiveness of the growing senior living market:



**The Proposed Transaction**

40.      In a press release dated August 22, 2012, the Company announced that it had entered into a merger agreement with Health Care REIT pursuant to which Health Care REIT, through Merger Subs, will acquire all of the outstanding shares of the Company for $14.50 per share.

41.      Health Care REIT had expressed interest in the Company since the end of 2011 and the beginning of 2012.

42.      During early 2012, the Board considered various strategic transactions for the Company and different possible transaction structures, including a sale of Sunrise's real estate business or a sale of the whole company, either to a single acquirer or to an acquirer of the real estate business and an acquirer of the management business, collaborating in a joint acquisition of the whole company.

43.      The Board entered into negotiations with various parties for different transaction structures, including negotiations with Health Care REIT which initially expressed interest in purchasing only the Company's real estate business.  Ultimately, in August 2012, Health Care REIT proposed to acquire the whole company.

44.      On August 21, 2012, the Board approved the $14.50 per share offer from Health Care REIT, approved the execution of the merger agreement and the $467 million financing commitment with Health Care REIT, and resolved to recommend to Sunrise stockholders that they vote in favor of the adoption of the merger agreement.

**The Proposed Transaction Undervalues the Company**

45.      Given the Company's recent strong performance and its positioning for growth, the Proposed Transaction consideration is inadequate and significantly undervalues the Company.

46.      The Proposed Transaction does not sufficiently take into account that an aging population will lead to increased demand for senior living. As stated in the August 22, 2012 article "Health Care REIT Buys Sunrise Senior for $845 Million," published on foxbusiness.com, "Senior-assisted living has become more of an attractive business model in recent years as baby boomers get older, the size of the nation's elderly population grows and older people increasingly require greater assistance."

47.      In addition, the Proposed Transaction consideration fails to adequately compensate Sunrise's shareholders for the significant synergies created by the merger. As described in an August 23, 2012 article titled "HCN to Acquire Sunrise Senior Living – Analyst Blog" published on Nasdaq.com, Health Care REIT "is likely to gain operational synergies as an

experienced and dynamic management team from Sunrise Senior Living, with over 30 years of experience, comes on board."

48.     Health Care REIT's Chairman and Chief Executive Officer, George Chapman, was quoted in Health Care REIT's August 22, 2012 press release as saying: "This acquisition powerfully advances our strategic vision: own the highest quality, private pay seniors housing communities in strong, growing, affluent markets and align with experienced, dynamic management teams." The same press release also detailed the strategic highlights of the Proposed Transaction for Health Care REIT:

**Strategic Highlights**

- **Institutional Quality Properties in High Barrier to Entry Markets.** The communities have a median age of eight years, and 90% of the communities are Sunrise's "mansion" prototype. The portfolio is concentrated in New York, Los Angeles, San Francisco, Washington, D.C., Philadelphia, Boston, Chicago, and London. Approximately 50% of the properties are located in top 5 MSAs and approximately 85% of the properties are located in top 20 MSAs within their respective countries.

- **Embedded Investment Pipeline in Excess of Two Billion Dollars.** The acquisition includes a real estate pipeline of more than $2 billion that could be realized over time by purchasing additional interests from existing Sunrise joint venture partners. At the time of acquisition, Health Care REIT expects to own on average an approximately 28% interest in the 105 joint venture communities. Of the 105 joint venture communities, 37 have purchase options that are exercisable in 2013, 13 have purchase options that are exercisable in 2014, and 21 are subject to buy/sell rights that could result in Health Care REIT acquiring a 100% ownership interest.

- **Acquisition Structured to Capture Strong NOI Growth.** Health Care REIT intends to structure ownership and operation of the wholly owned communities and any joint venture communities, if and when acquired, under RIDEA. Health Care REIT expects property-level net operating income to increase 4% to 5% per year on average over the long term, assuming economic conditions consistent with the current market.

- **Future Value Creation.** Health Care REIT expects to create additional value for shareholders when joint venture interests are acquired, existing debt is refinanced, and operational and structural efficiencies are achieved.

- **Enhanced Diversification and Private Pay Component.** The transaction is expected to increase Health Care REIT's private pay percentage from 74% to 77%. Sunrise will become Health Care REIT's second largest operator at approximately 11% of the portfolio based on investment balance.

49. Despite the significant synergies inherent in the transaction for Health Care REIT, the Board failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Health Care REIT.

**Company Executives Receive Compensation and Other Benefits Not Available to Shareholders as a Result of the Merger**

50. Although the Proposed Transaction does not maximize shareholder value, the Company's named executive officers and board members will receive lucrative cash awards and other benefits not available to shareholders as a result of the Proposed Transaction. Indeed, the Preliminary Proxy states:

> When considering the recommendation of the Sunrise board with respect to the proposed transactions, you should be aware that Sunrise's executive officers and directors may have interests in the proposed transactions that are different from, or in addition to, those of Sunrise's stockholders more generally. These interests may present such executive officers and directors with actual or potential conflicts of interest.

51. Sunrise's management negotiated a deal that ensures their employment after the consummation of the Proposed Transaction. The Company included a "Question and Answer" document as part of the 8-K it filed with the SEC on August 22, 2012 specifying that Sunrise's management would stay in place after the Proposed Transaction. As stated in the "Question and Answer" document:

> Q: Does the current Sunrise management team expect to stay in place as a result of this announcement?
>
> A: *Yes. It is expected that the current Sunrise management team will stay in place* during this transaction process. As a management company, Sunrise's

14

leaders will focus on improving the day-to-day operations at Sunrise, and impacting even more seniors through our best-in-class approach to care. [Emphasis added].

52.     In addition, certain of the Company's officers and directors currently hold stock options, performance-based restricted stock units and/or restricted shares. Pursuant to the terms of the Merger Agreement, stock options outstanding under the Company's equity compensation plans will vest and be converted into the right to receive cash equal to the excess of the Proposed Transaction price over the exercise price for each stock option. Each share of restricted stock outstanding will vest and become free of restrictions and eligible to receive cash equal to the Proposed Transaction price in the same manner as other shares of common stock. Restricted stock units will similarly vest and become free of restrictions and eligible to receive cash equal to the Proposed Transaction price. The table below indicates the consideration to be received by the Individual Defendants:

| | Vested Stock Options | Unvested Stock Options | Shares of Restricted Stock | Restricted Stock Units | Performance Units | Total ($) |
|---|---|---|---|---|---|---|
| Mark S. Ordan | 20,834,496 | 7,040,004 | 476,717 | 660,939 | 6,019,211 | 35,031,367 |

| | Vested Stock Options ($) | Restricted Stock Units ($)(1) | Deferred Vested Shares ($) | Total ($) |
|---|---|---|---|---|
| Glyn F. Aeppel | — | 42,282 | 126,846(2) | 169,128 |
| Thomas J. Donohue(3) | 109,620(4) | 42,282 | 300,556(5) | 452,458 |
| Stephen D. Harlan | — | 42,282 | 300,556(6) | 342,838 |
| Paul J. Klaassen | — | 42,282 | 300,556(7) | 342,838 |
| Lynn Krominga | — | 42,282 | 126,846(8) | 169,128 |
| William G. Little(9) | — | 42,282 | 300,556(10) | 342,838 |

53.     Additionally, Defendant Ordan will receive golden parachute compensation totaling approximately $20 million.

54.     Based on the above, the Proposed Transaction reflects an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Sunrise's public shareholders.

**The Preclusive Deal Protection Devices**

55.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

56.     Section 7.4(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Health Care REIT. Section 7.4(a) demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.

57.     Pursuant to Section 7.4(b) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Health Care REIT of the bidder's identity and the terms of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Health Care REIT in order to enter into the competing proposal, it must grant Health Care REIT four business days and allow Health Care REIT to amend the terms of the Merger Agreement to make a counter-offer so that the competing proposal would no longer "continue to constitute a Superior Offer." In other words, the Merger Agreement gives Health Care REIT access to any rival bidder's information and allows Health Care REIT a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Health Care REIT and piggy-back upon the due diligence of the foreclosed second bidder.

58.     The Merger Agreement also provides that a termination fee of $40 million must be paid to Health Care REIT by Sunrise if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.  This represents a termination fee of roughly 4.7% of the transaction value, which is extraordinarily high and outside of the range of reasonability often cited by the Delaware courts.

59.     Moreover, the Company disclosed that it had entered into the Poison Pill Amendment granting a limited exemption only to Health Care REIT to exceed the poison pill's ownership limitations. As stated in a Form 8-K filed with the SEC on August 22, 2012:

> **Rights Agreement Amendment**
>
> Also on August 22, 2012, Sunrise entered into Amendment No. 4 (the "*Rights Agreement Amendment*") to the Rights Agreement, dated as of April 24, 2006, between Sunrise and American Stock Transfer & Trust Company, as Rights Agent (the "*Rights Agreement*"). The Rights Agreement Amendment provides that neither the approval, execution or delivery of the Merger Agreement, nor the consummation of transactions contemplated thereby, including the Mergers, will (i) cause the Rights to become exercisable, (ii) cause HCN, Merger Sub, Holdco, Holdco Sub or any of their respective Affiliates or Associates to become an Acquiring Person, or (iii) give rise to a Section 11(a)(ii) Event, Section 13 Event, Distribution Date nor a Stock Acquisition Date (as such terms are defined in the Rights Agreement). The Rights Agreement Amendment also provides that the Rights Agreement shall automatically expire immediately prior to the effective time of the Mergers.

This action effectively precludes any other person from launching a competing bid for Sunrise in a situation where the directors have decided to sell the Company and its shareholders no longer need the protection of a poison pill. Thus, the Poison Pill Amendment being limited to Health Care REIT lacks a proper corporate purpose and is an unnecessary and unreasonable deal protection device that serves only to insulate the Proposed Transaction from the possibility of a potentially superior alternative bid.

60.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**The Materially Incomplete Preliminary Proxy**

61.     The Preliminary Proxy filed by the Company on September 28, 2012 fails to provide shareholders with complete and accurate material information necessary for them to make an informed decision regarding whether or not to vote in favor of the Proposed Transaction. As set forth in more detail below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things, (1) the sales process for Sunrise, (2) the financial valuation exercises that purport to support the Fairness Opinion rendered by Goldman Sachs & Co. ("Goldman Sachs"), Sunrise's financial advisor for the Proposed Transaction, (3) the forecasts provided to the financial advisors by Sunrise's management team, and (4) the retention of Sunrise management following consummation of the Proposed Transaction.

62.     With regard to the "Background of the Merger" section, the Preliminary Proxy fails to provide shareholders with the following information:

(a)     how the Board identified the "five potentially interested parties" with whom it entered into confidentiality agreements during the end of 2011 and the beginning of 2012;

18

(b)     whether any of those confidentiality agreements, other than with Health Care REIT, contained a standstill agreement, and what the terms of all standstill agreements were;

(c)     how the Board identified "potential third parties that might be interested in engaging" in strategic transactions with the Company on or around February 29, 2012;

(d)     whether any of the potential third parties had previously entered into a confidentiality agreement with the Company;

(e)     the Board's basis for deciding to hire an additional financial advisor, KeyBanc Capital Markets Inc. ("KeyBanc"), and the Board's basis for selecting KeyBanc specifically;

(f)     what role the Board engaged KeyBanc to undertake, the specific work actually performed by KeyBanc, the terms of that engagement, and any remuneration received by KeyBanc for its work;

(g)     whether as of April 20, 2012, "potential acquirors of the real estate business and the management business" had been identified, and the Board's basis for determine these parties would need to be strategically paired;

(h)     how the Board identified the private equity forms, on-site service provider, and companies in the senior living and real estate industries that entered into confidentiality agreements with the Company between April 2012 and May 2012;

(i)     the total number of parties who had entered into confidentiality agreements with the Company and were granted access to the data room between April 2012 and May 2012, and the type of business in which each party is involved;

(j) the total number of parties participating in the bid process as of June 5, 2012, and the type of business in which each party is involved;

(k) the collaborations authorized by the Company between interested parties as of June 5, 2012;

(l) the number of first-round bid process letters sent between June 7 and June 13, 2012, and the number of parties who received each type of letter;

(m) the number of parties who sent preliminary indications of interest between June 21 and June 25, 2012 that were interested in the real estate business, the number of parties interested in the management business, and the number of parties interested in the Company as a whole;

(n) the respective strengths and weaknesses of each of the bids received, as discussed by the Board on June 25, 2012;

(o) the Board's basis for pairing Health Care REIT with Companies X and Y in order to present a joint bid for the Company;

(p) the Board's basis for pairing Company A with Firm M in order to present a joint bid for the Company; and

(q) the Board's basis for concluding Firms N and O's joint indication of interest for the management business for between $325 million and $350 million was "significantly lower than the prices set forth in the indications of interest provided by the other parties interested in the management business."

63. This information which bears directly on the process undertaken by the Board and their recommendation of the Proposed Transaction is material to Sunrise shareholders. The omission of this information regarding the process renders all statements pertaining to the

Board's belief that the Proposed Transaction is more favorable to Sunrise stockholders than remaining independent or other strategic alternatives reasonably available to Sunrise and its stockholders, including selling or spinning off Sunrise's management business or real estate business misleading.

64.     With regard to the "Opinion of Goldman Sachs & Co." section, the Preliminary Proxy fails to provide certain underlying data and key inputs necessary for shareholders to have a fair summary of the work performed, including:

(a)     with respect to the *Selected Companies Analysis for Sunrise*, the resulting implied present values for Sunrise as determined by the analysis;

(b)     with respect to the *Premia Paid Analysis,* Goldman Sachs' basis for selecting all of the transactions between January 1, 2002 and April 17, 2012 involving companies valued between $250 million and $2.5 billion, as well as the basis for selecting that date range, the total number of transaction selected, and the high and low premiums and how the Company compares at the 1-day, 1-week, and 4-week marks;

(c)     with respect to the *Illustrative Discounted Cash Flow Analysis for Sunrise's Real Estate Business,* the unlevered free cash flows for Sunrise's real estate business, Goldman Sachs' basis for selecting 6-8% as the appropriate discount rate to apply to terminal value, the methodology employed by Goldman Sachs in calculating Sunrise' weighted average cost of capital, and whether Goldman Sachs calculated the implied present value range for the Sunrise real estate business in the Proposed Transaction;

(d)     with respect to the *Selected Transactions Analysis for Sunrise's Real Estate Business,* the cap rates observed for each selected transaction, particularly considering the

cap rate range used by Goldman Sachs to value Sunrise does not even encompass the median observed in this analysis;

(e)     with respect to the *Selected Companies Analysis for the Sunrise Real Estate Business,* the multiples observed for each selected company;

(f)     with respect to the *Illustrative Discounted Cash Flow Analysis for Sunrise's Management Business,* Goldman Sachs' basis for determining perpetuity growth rates of 2-4% and the methodology employed by Goldman Sachs in calculating Sunrise's management business weighted average cost of capital; and

(g)     whether Goldman Sachs performed selected companies or selected transactions analyses for the management business.

65.     This information, which formed the basis for Goldman Sachs' various analyses, is material to shareholders.  Without an understanding of the underlying inputs and objective criteria used by Goldman Sachs in its analyses, shareholders have no understanding of what factors influenced the financial advisor's analyses, thereby rendering all statements pertaining to the analyses misleading.

66.     With regard to the "Financial Forecasts" section, the Preliminary Proxy fails to provide Sunrise's shareholders with the unlevered cash flows or prospective financial information for the real estate business and the management business, as highlighted in the *Illustrative Discounted Cash Flow Analysis for Sunrise's Real Estate Business* in Goldman Sachs' fairness opinion. The Financial Forecasts also fail to provide all the necessary line items in the "Selected Unaudited Prospective Financial Information" prepared by Sunrise's management and provided to the Board and financial advisors to calculate unlevered free cash flows for the Company as a whole.

67.     Information regarding the financial forecasts of Sunrise is material to Sunrise shareholders given the reliance by Goldman Sachs on such information in its fairness opinion. The absence of these underlying financial projections renders the various valuation analyses conducted by Goldman Sachs misleading

68.     The Preliminary Proxy also fails to provide Sunrise's shareholders with information regarding the retention of Sunrise's management following consummation of the Proposed Transaction.   Although an earlier public statement by the Company indicated that management would stay in place, the Preliminary Proxy fails to provide shareholders with any information regarding whether Health Care REIT is retaining management and any negotiations pertaining to management retention that may have occurred.

69.     Information regarding potential conflicts of interest on the part of management is material to shareholders.   Without this information, the Board's statements regarding the thoroughness of the process and their recommendation of the Proposed Transaction are rendered misleading.

70.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## LOSS CAUSATION

71.     Defendants' material omissions in the Preliminary Proxy have substantially contributed to the economic loss that Plaintiff has incurred in being asked to vote in favor of the Proposed Transaction.

72.     Plaintiff are being asked to vote in support of the Proposed Transaction pursuant to information in the Preliminary Proxy, which unless amended by Defendants, will be the documents pursuant to which Sunrise shareholders will be asked to render a vote on the

Proposed Transaction. As detailed above, the Preliminary Proxy fails to provide Sunrise shareholders with material information necessary for them to make an informed decision regarding whether or not to vote in favor of the Proposed Transaction. This information must be contained in an amendment to the Preliminary Proxy.

73.     It is pursuant to this materially incomplete and misleading Preliminary Proxy that shareholders are being asked to determine whether they believe the insufficient consideration of $14.50 per share is fair and adequate.

74.     In addition, as described above, the Proposed Transaction price does not adequately take into account the Company's recent strong performance and its growth prospects.

75.     Thus, this Preliminary Proxy soliciting Sunrise shareholder support and containing material omissions demonstrates that the Board has accepted an insufficient price for the Company and is recommending that shareholders do the same while failing to provide them with all material information necessary to make a decision regarding whether or not to vote in favor of the Proposed Transaction.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duties
### (Class Claim Against All Individual Defendants)

76.     Plaintiff repeats all previous allegations as if set forth in full herein.

77.     The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care and loyalty owed to the public shareholders of Sunrise and have acted to put their personal interests ahead of the interests of Sunrise shareholders.

78.     The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities

to maximize Sunrise's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

79.     The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of Sunrise because, among other reasons:

(a)     they failed to take steps to maximize the value of Sunrise to its public shareholders and took steps to avoid competitive bidding;

(b)     they failed to properly value Sunrise;

(c)     they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction; and

(d)     they failed to provide shareholders with material information necessary for them to make an informed decision regarding whether to vote in favor of the Proposed Transaction or to seek appraisal for their shares.

80.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff will suffer irreparable injury in that he has not and will not receive his fair portion of the value of Sunrise's assets, will be prevented from benefiting from a value-maximizing transaction, and will be forced to vote on the Proposed Transaction without material information.

81.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of Plaintiff.

82.     Plaintiff has no adequate remedy at law.

## COUNT II
### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder
### (Brought Individually Against All Individual Defendants)

83.     Plaintiff repeats all previous allegations as if set forth in full herein.

84.     Defendants have issued the Preliminary Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

85.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

86.     Specifically, the Preliminary Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above, and sets forth materially misleading information. Moreover, in the exercise of reasonable care, Defendants should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

87.     The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT III
### Violations of Section 20(a) of the Exchange Act
### (Brought Individually Against All Individual Defendants)

88.     Plaintiff repeats all previous allegations as if set forth in full herein.

89.     The Individual Defendants acted as controlling persons of Sunrise within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Sunrise and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the

Preliminary Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false or misleading.

90.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Preliminary Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issues and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Preliminary Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the takeover.  They were thus directly involved in the making of this document.

92.     In addition, as the Preliminary Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiation, reviewing, and approving the takeover.  The Preliminary Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants.

93.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons,

these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Sunrise's shareholders will be irreparably harmed.

## COUNT IV
### Aiding and Abetting
### (Class Claim Against Health Care REIT, and Merger Subs)

95.     Plaintiff repeats all previous allegations as if set forth in full herein.

96.     As alleged in more detail above, Defendants Health Care REIT, and Merger Subs have aided and abetted the Individual Defendants' breaches of fiduciary duties.

97.     As a result, Plaintiff and the Class members are being harmed.

98.     Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated: October 15, 2012

Elizabeth K. Tripodi, VA Bar #73483
LEVI & KORSINSKY LLP
1101 30th Street, NW
Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121